## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| GAMER ROBOT, LLC, | : |
| Plaintiff, | : |
| vs. | : |
| BILL J. WALTON, ACCELERATED WEALTH ADVISORS LLC doing business as ACCELERATED WEALTH, LUKE VANZO, and JOHN DOES 1-10 and XYZ CORPORATIONS 1-10, | : |
| Defendants. | : |

Civil Action No.

**Jury Trial Requested**

## COMPLAINT

Plaintiff GAMER ROBOT, LLC ("Plaintiff" or "Gamer Robot"), by way of complaint against defendants BILL J. WALTON ("Walton"), ACCELERATED WEALTH ADVISORS LLC doing business as ACCELERATED WEALTH ("AWA"), LUKE VANZO ("Vanzo"), JOHN DOES 1-10 and XYZ CORPORATIONS 1-10, alleges as follows:

## INTRODUCTION

1.      Plaintiff brings this civil action pursuant to Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, and for various violations of state law, including breach of contract, breach of fiduciary duty, and unjust enrichment, and to redress Defendants' fraudulent and other wrongful conduct in connection with Defendants' provision of investment-related services to Plaintiff.

2.      As set forth more fully below, this case arises out of the recommendation and implementation of a plainly unsuitable $10,000,000 investment in the Aries Linden municipal

revenue bonds (the "Aries Bonds") by Plaintiff's trusted investment adviser, defendant Bill J. Walton, and his firm, defendant Accelerated Wealth Advisors LLC ("AWA"), including its president, Luke Vanzo. While holding themselves out as fiduciaries charged with protecting and prudently Plaintiff's assets, Walton, Vanzo and AWA instead steered Plaintiff into a speculative, distressed, and highly illiquid bond position based on misleading assurances and material omissions, and failed to conduct reasonable diligence or provide full and fair disclosure, in violation of their duties under contract, federal securities laws and state law.

3.     Among other things, Defendants misrepresented the safety and backing of the Aries Bonds, omitted material information about their risks and illiquidity, and caused Plaintiff to concentrate $10,000,000 of capital in the Aries Bonds notwithstanding Plaintiff's moderate-risk, short-term growth objective.

4.     Defendants' misconduct toward Gamer Robot did not occur in isolation. During the same time period Defendants engaged in a broader pattern of self-interested and fraudulent conduct involving the assets of Gamer Robot's principal and affiliated entities, including transactions marked by undisclosed conflicts and self-dealing. Those broader wrongs are the subject of a separate lawsuit and are referenced here solely to provide context regarding Defendants' motive, intent, and course of conduct.

5.     These conflicted and unsuitable recommendations have caused Plaintiff to suffer losses, opportunity-cost damages, and ongoing exposure to further harm.

## JURISDICTION AND VENUE

6.     The Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1331.

7.     The Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper pursuant to 28 U.S.C. § 1391 in that Defendants are located in this District and/or many of the acts complained of occurred here.

9.      Plaintiff is entitled to a jury trial.

## THE PARTIES

10.     Plaintiff Gamer Robot, LLC ("Gamer Robot") is a limited liability company organized under the laws of Puerto Rico, with its principal place of business located in Puerto Rico.

11.     Defendant Accelerated Wealth Advisors LLC ("AWA") is a limited liability company organized under the laws of Colorado, with its principal place of business located at 13570 Meadowgrass Drive, Suite 100, Colorado Springs, Colorado.  AWA is a registered investment adviser with the United States Securities and Exchange Commission providing investment advisory and wealth management services.

12.     Defendant Bill J. Walton ("Walton") is an individual residing in Dorado, Puerto Rico.  Walton is a registered investment adviser representative associated with AWA, and is licensed as an insurance producer in the state of Colorado.  At all relevant times, Walton acted as Plaintiff's primary investment adviser and was responsible for providing investment advisory services to Plaintiff on behalf of AWA.

13.     Defendant Luke Vanzo ("Vanzo") is an individual residing in Castle Rock, Colorado.  Vanzo is a registered investment adviser representative associated with AWA, and is president of AWA.  At all relevant times, Vanzo acted as Plaintiff's investment adviser representative and was responsible for providing investment advisory services to Plaintiff on behalf of AWA.

14.     Defendants John Does 1–10 and XYZ Corporations 1–10 are, upon information

and belief, individuals and business entities whose true names and capacities are presently unknown to Plaintiff, who directly participated in, aided and abetted, facilitated, controlled, and/or otherwise were complicit in the wrongful acts and omissions alleged in this Complaint and/or who received, held, transferred, or otherwise benefitted from Plaintiff's funds or assets as a result of such acts and omissions.  Plaintiff may amend this Complaint to substitute the true names and capacities of these Defendants when their identities and roles have been ascertained.

## **FACTUAL ALLEGATIONS**

15.    In or about December 2024, Walton, Vanzo and AWA began providing investment advisory and wealth management services to Plaintiff.  While occupying a position of trust and professing to act as fiduciaries, Walton, Vanzo and AWA caused Plaintiff to enter into a heavily concentrated private markets program.

16.    Plaintiff entered into an Assets Under Advisement Investment Agreement with AWA, dated December 12, 2024.

17.    The December 12, 2024 Assets Under Advisement Investment Agreement – executed by Vanzo on behalf of AWA – provides, at Exhibit I, that Plaintiff's investment objective is "Investment Growth".

18.    The Agreement's Exhibit I further provides that "**[i]t is the duty of the Advisor to treat the Client(s) with a Fiduciary Standard of Care – meaning the Client's interests will always be at the forefront – ahead of the interests of any individual Advisor representative or the firm**.  The Advisor will use various methods including this IPS [Investment Policy Statement] and Client interviews, conversations, and meetings to collect the information needed to create this IPS document and to recommend an action plan of investment strategies and/or portfolio investments that are designed to accomplish the Client's goals and objectives". (emphasis

in the original).

19.     The December 12, 2024 Agreement further provides that the Agreement's IPS will "[d]efine the Client's current financial situation", "[e]stablish performance measures and benchmarks to be used if applicable", "[d]escribe proposed investment strategies and styles to be used by Advisor if applicable", and "[e]stablish guidelines for portfolio rebalancing if applicable". However, the December 12, 2024 agreement's IPS did not include any such entries or information.

20.     The December 12, 2024 agreement further states that, "[i]t is agreed that the Investment Policy Statement is a work in progress that *must* be updated frequently in order to remain relevant and appropriate". (emphasis added).

21.     At and around the time that Walton, Vanzo and AWA began providing investment advisory service to Plaintiff, AWA's Form ADV (Part 2A) Firm Brochure, dated September 2023, provided in relevant part that:

> As a client of AWA your investment adviser representative will also serve as an insurance agent under our affiliated insurance agency Accelerated Wealth, LLC. This means your investment adviser representative, acting as an insurance agent, will recommend you place your assets in insurance products and annuities when he or she believes it is in your best interest to do so.
>
> Insurance products and annuities pay commissions to Accelerated Wealth, LLC and to the owners of AWA in their separate capacity as insurance agents. This presents a conflict of interest to your investment adviser representative as he or she will be more inclined to recommend you place your assets in either insurance products or an advisory account depending on which would pay us more.
>
> AWA has taken steps to manage this conflict of interest by requiring that each investment adviser representative (i) only recommend insurance and annuities when in the best interest of the client and without regard to the financial interest of AWA, its owners and its investment adviser representative or Accelerated Wealth, LLC and its insurance agents, (ii) not recommend insurance and/or annuities which result in your investment adviser representative acting as an insurance agent and/or AWA or Accelerated Wealth, LLC receiving unreasonable compensation related to the recommendation, and (iii)

disclose in writing to a client the anticipated commission that Accelerated Wealth, LLC and/or our investment adviser representatives acting in their separate capacity as insurance agents will receive from the recommended insurance or annuity carrier and any material conflicts of interest related to insurance or annuity recommendations.

22.     The Firm Brochure also stated, within Item 8, that "AWA emphasizes diversification as well as risk when evaluating investment manager strategies for inclusion in a client investment portfolio."

23.     Thus, Walton, Vanzo and AWA acknowledged and were well aware of (i) the conflicts of interest inherent in their services, (ii) their obligation to act in Plaintiff's best interests, and (iii) their obligation – expressly promised in their ADV materials – to disclose, mitigate, and manage those conflicts.

24.     Similarly, AWA's Compliance Manual, effective September 2022, specifically provided in sections 1.4 and 1.5 that:

1.4. Investment Adviser as a Fiduciary

The Firm has adopted the procedures set forth in this Manual to ensure that the Firm and its employees fulfill its fiduciary obligations to its clients. Every employee is responsible for understanding and complying with the rules and procedures set forth in this Manual. Each employee shall at the least, annually sign a written statement in the form of the employee Acknowledgement for Investment Advisory Representatives and Associated Persons Form acknowledging his or her receipt and understanding of, and agreement to abide by, the policies described in this Manual.

1.5. The Firm

AWA is a SEC registered investment adviser under the federal Investment Advisers Act of 1940 (the "Advisers Act").

Section 206 of the Advisers Act makes it unlawful for the Firm to engage in fraudulent, deceptive or manipulative conduct. In addition to these specific prohibitions, the Supreme Court of the United States has held that Section 206 imposes a fiduciary duty on investment advisers.

6

As a fiduciary, the Firm owes its clients more than honesty and good faith alone. The Firm has an affirmative duty to act solely in the best interests of its clients and to make full and fair disclosure of all material facts, particularly where the Firm's interests may conflict with those of its clients.

Pursuant to this duty, the Firm must at all times act in its clients' best interests, and the Firm's conduct will be measured against a higher standard of conduct than that used for mere commercial transactions. Among the specific obligations that the SEC has indicated flow from an adviser's fiduciary duty are:

- A duty to have a reasonable, independent basis for its investment advice;

- A duty to obtain best execution for clients' securities transactions, where the adviser is in a position to direct brokerage transactions;

- A duty to ensure that its investment advice is suitable to the client's objectives, needs and circumstances;

- A duty to refrain from effecting personal securities transactions inconsistent with client interests; and

- A duty to be loyal to clients.

25.    The Compliance Manual contains a "Prohibited Acts" attachment, for acknowledgement by AWA's representatives, which provides in part that:

INVESTMENT ADVISORY REPRESENTATIVES, SUPERVISED PERSONS AND AFFILIATED PERSONS OF ACCELERATED WEALTH ADVISORS, LLC (THE "COMPANY") ARE SPECIFICALLY PROHIBITED BY COMPANY POLICY FROM THE FOLLOWING:

2. To accept, directly or indirectly, from any person, firm, corporation or association, other than the Company, compensation of any nature as a bonus, commission, fee, gratuity or other consideration in connection with any transaction on behalf of the Company or a Client Account.

4. Act as personal custodian or trustee of securities, stock powers, money, or other property belonging to a client of the Company.

5. Maintain a joint account in securities with any client or share any benefit with any client resulting from a securities transaction.

6. Transfer any customer or client asset to own name or name of member of immediate family.

9. Borrow money or securities from a client.

10. Agree to repurchase at some future time a security from a client for his or her own account, or for any other account.

11. Utilize a personal Web site, instant messaging, text messaging, and or a personal e-mail address to communicate with clients regarding investment matters or matters related to their account with Accelerated Wealth Advisors, LLC[.]

### A.  **Unsuitable Investments – Aries Linden Bonds**

26.    In connection with Defendants' provision of investment-advisory and wealth-management services to Plaintiff, Defendants caused Plaintiff to maintain a brokerage account at Sanders Morris LLC ("Sanders Morris"), through which Defendants could implement securities transactions for Plaintiff's benefit.

27.    Plaintiff's new-account documentation for the Sanders Morris account reflected a moderate investment knowledge level, a "short-term growth" investment objective, and a moderate risk tolerance.

28.    Defendants were required to design and implement recommendations consistent with those stated parameters, including the need for liquidity, reasonable diversification, and avoidance of speculative or distressed credits that were inconsistent with a moderate-risk profile.

29.    Notwithstanding Plaintiff's stated investment profile, Defendants caused Plaintiff to purchase and hold a highly speculative, illiquid, subordinated project-finance bond position tied to a single, distressed waste-processing facility project – an exposure that was facially incompatible with Plaintiff's objectives, liquidity needs, and risk tolerance.

30.    On December 26, 2024, Defendants caused Plaintiff to purchase $10,000,000 in

principal amount of municipal revenue bonds issued by the Union County, New Jersey Improvement Authority and associated with the "Aries Linden" biosolids gasification facility project in Linden, New Jersey (the "Aries Bonds").

31.     The facility, operated by Aries Linden, LLC, engaged in "first-of-its-kind"[1] operations endeavoring to employ a gasification technology to convert biosolid waste to energy (the "Aries Linden" facility or project).

32.     The Aries Linden facility was, in effect and practice, a prototype endeavor.

33.     Multiple bond series were issued with respect to the Aries Linden facility between 2019 and 2024 to finance the same underlying project.

34.     The Aries Bonds were structured as Solid Waste Disposal Revenue bonds and, critically, were issued as subordinated obligations – meaning they ranked below other project debt in priority of payment and therefore carried materially heightened default and loss severity risk.

35.     According to public announcements in October 2019, the Aries Linden project involved a $65 million financial close, with $50 million in "Green" tax-exempt bonds issued through the Union County Improvement Authority.

36.     The project was touted as utilizing patented fluidized bed gasification technology to process biosolids in an environmentally friendly manner.

37.     When the initial financing proved inadequate, a second series, designated CUSIP 906352AC3, was issued in 2021, with a maturity date of June 1, 2041 and a coupon of 8.5%.

38.     The original principal amount of the 2021 series was $11,500,000.

39.     The increase in the coupon rate from 6.75% to 8.5% in just two years signaled growing concerns about the project's viability and increased credit risk.

---

[1] See Aries website article titled "*Aries Clean Technologies Announces that its Linden, NJ Gasification Technology Achieved Integrated Operations*", dated October 8, 2024.

40.    More alarmingly, this series has experienced no trades whatsoever in the past two years, demonstrating extreme illiquidity and market concerns about the investment.

41.    The project's financial difficulties continued to mount, requiring yet another financing.  In 2023, a third series, designated CUSIP 906352AE9, was issued with a maturity date of June 1, 2041 and a coupon of 12.5%.

42.    The original principal amount of the 2023 series was $8,500,000.

43.    The 2023 series is explicitly subordinate to all previous bond series.

44.    The dramatic increase in the coupon rate to 12.5%, nearly double the original 6.75% rate, signaled severe financial distress.

45.    A creditworthy borrower does not typically pay 12.5% interest unless it is in serious financial difficulty.

46.    Unsurprisingly, a fourth round of bond fundraising took place in late 2024 – which is the series that Defendants caused Plaintiff to invest in (i.e., the Aries Bonds).

47.    The authorized principal amount for this newest issue was up to $21,500,000.

48.    Like the 2023 series, this series is subordinate to all previous bond issuances, placing it last in line for repayment.

49.    The 2024 bonds bore CUSIP 906352AF6 and were issued on December 12, 2024 – just fourteen (14) days before the $10,000,000 purchase was made for Plaintiff's account.

50.    The 2024 bonds carried an interest rate of 12.500% per annum, payable semi-annually on June 1 and December 1 of each year, with a maturity date of June 1, 2041 (a term of approximately seventeen years from the date of purchase).

51.    The first coupon payment was not scheduled until June 1, 2025.

52.    Defendants caused Plaintiff to pay a purchase price of $101.00 (i.e., 101% of par),

for a total cost of $10,100,000 on a $10,000,000 face amount.

53.    Paying a premium price for a newly issued, subordinated, project-finance municipal revenue bond – issued only two weeks earlier – was highly unusual and economically irrational for a client with Plaintiff's stated profile, and it embedded a guaranteed $100,000 loss of principal if the bond were held to maturity, requiring Plaintiff to 'earn back' the premium through interest payments over time.

54.    The Aries Bonds' yield-to-maturity of approximately 12.353% further confirmed that the bonds were not "high-yield" because they were an attractive opportunity; rather, the yield reflected extreme credit and liquidity risk.

55.    In late 2024, when investment-grade municipal bonds yielded far less, a 12.5% coupon rate on a municipal revenue bond signaled that the market perceived the underlying borrower/project as distressed and that investors were demanding extraordinary compensation for taking default and loss risk.

56.    The progression of these bond issuances tells a clear story of a project in escalating financial distress.  Yet, Defendants recommended the purchase of the bonds on the cusp of the Aries Linden project's collapse.

57.    Over approximately five years, Aries Linden, LLC issued or authorized bonds totaling over $90 million, far exceeding the original $65 million project cost estimate.

58.    The escalating coupon rates from 6.75% in 2019 to 12.5% in 2023 and 2024 demonstrate the increasing credit risk and deteriorating financial condition of the project.

59.    Each successive issuance was at a higher interest rate and with greater subordination, reflecting the market's assessment of mounting risk.

60.    Notably, the trade confirmation reflects that Plaintiff's transaction was executed at

approximately 8:36 a.m. Eastern time on the day after Christmas, with trade date and settlement date both on December 26, 2024.

61.     The timing of the trade further supports the inference that Defendants did not devote reasonable care or diligence to an investment analysis commensurate with the size, complexity, and risk of the transaction and that Plaintiff did not have a meaningful opportunity to evaluate the transaction (including pricing) before it was implemented.

62.     The Aries Bonds carried still another feature that made them unsuitable for Plaintiff – they were subject to the Alternative Minimum Tax ("AMT"), as disclosed on the trade confirmation.

63.     AMT treatment reduces or eliminates the tax-exempt benefit that ordinarily drives municipal-bond demand and pricing, and it contributes to lower prices (higher yields) relative to comparable non-AMT municipal bonds.

64.     Defendants did not reasonably account for, explain, or mitigate this additional economic and tax risk in recommending and implementing the investment.

65.     The Aries Bonds were also unsuitable because they were part of a sequence of repeat financings evidencing a project in escalating distress.

66.     As the project repeatedly required additional capital, coupon rates escalated dramatically – from approximately 6.75% in the initial financing to 8.5% in 2021, and to 12.5% in the later 2023–2024 series – reflecting rising credit risk and deterioration in project viability.

67.     Each successive series also carried greater subordination, placing later investors closer to last-in-line status for repayment.

68.     Multiple additional red flags made the Aries Bonds plainly unsuitable for a moderate-risk, short-term growth investor.

69.    The Aries Bonds were effectively project-finance securities concentrated in a single facility, with significant construction/completion risk, technology risk (i.e., the project was marketed as relying on a "first-of-its-kind" specialized gasification technology at a prototype facility), operational risk, and revenue-generation risk.

70.    They were also extremely illiquid in that trading activity in certain Aries bond series was minimal or non-existent for extended periods – meaning investors could not reliably exit positions at any price – constituting an anathema to a "short-term growth" objective requiring liquidity and the ability to redeploy capital.

71.    In short, Defendants caused Plaintiff to purchase a long-dated (to 2041), subordinated, illiquid, distressed project-finance municipal revenue bond position with an unusually high coupon and yield.

72.    This type of security is appropriate, if at all, only for sophisticated investors willing to accept substantial risk of loss and illiquidity in exchange for yield, and not for a moderate-risk investor pursuing short-term growth.

73.    The foreseeable credit risks embedded in the Aries Bonds later materialized into events of default and acceleration in the Aries project's senior debt.

74.    On October 29, 2025, the trustee for the Series 2019 Aries bonds issued a Notice of Acceleration and Application of Funds declaring that events of default had occurred and were continuing, and bondholders directed the trustee to accelerate principal and accrued interest.  On October 31, 2025, bondholders received only a partial payment totaling approximately $3.19 million, reflecting a payment of only approximately $41.50 per $1,000 of principal.  Even at the senior level, bondholders had already suffered principal impairment and faced the prospect of substantial additional losses.

75.    The outlook for later subordinated bondholders has been even more dire.  By their express terms, these later subordinated series – including Plaintiff's Aries Bonds – are behind the senior 2019 bonds in priority of payment.

76.    Given that the senior 2019 bonds suffered events of default and required acceleration and liquidation of available funds, the subordinated bondholders face near-certain substantial losses, potentially including complete loss of principal.

77.    Indeed, the Aries Linden facility has ceased operations as of December 2025, and the bond values have effectively collapsed.

78.    Specifically, on December 4, 2025, Aries Linden announced to its investors and bondholders that it had implemented a plan to "idle" its operations, that it was terminating the employment of substantially all of its employees, and that "the Company anticipates that the plant will be in "idle" status by December 31, 2025".

79.    More specifically, the December 4, 2025 notice from Aries Linden states in relevant part that:

> Over the past year, the Company has been attempting to raise additional funding from outside investors to help support the necessary repairs of the plant, but, despite its efforts, the Company has been unable to attract new investors, and the Company is running out of money to sustain operations at the plant. Accordingly, the Company needs to idle all operations at the plant to conserve cash and buy time to work on potentially restructuring its debt and completing a plan for repair work to the plant to permit sustained continuous operations.
>
> Given that operations at the plant will be in "idle" status, the Company has not prepared or filed, and will not be preparing or filing, with the Trustee for the Bonds or on EMMA, any operating and/or capital budgets for the plant for fiscal year 2026, as required by the Loan Agreements and the Continuing Disclosure Agreements relating to the Bonds.

80.    In short, Plaintiff's Aries Bonds investment is now effectively a complete loss.

81.    Accordingly, as a direct and proximate result of Defendants' unsuitable recommendation and implementation of Plaintiff's Aries Bonds investment, Plaintiff has suffered substantial losses and damages, including loss of principal, loss of expected interest income, illiquidity harms, and significant opportunity-cost damages from having $10.1 million tied up in a distressed and now effectively worthless position instead of being deployed in liquid, diversified investments consistent with Plaintiff's moderate-risk, short-term growth objectives.

82.    Defendants' conduct demonstrates actual knowledge of or reckless disregard for Plaintiff's interests.

### B.    Misleading, Exaggerated, and/or False Commentary and Return Projections

83.    During their relationship with Plaintiff, Walton, Vanzo and AWA provided Plaintiff with misleading, incorrect, exaggerated, and/or false commentary and projections regarding the status, performance, risk profile, and expected returns of investments they recommended, managed, and/or caused Plaintiff to enter.

84.    For example, on or about February 25, 2025, during a quarterly review call with Plaintiff (the "February 25, 2025 Call"), Walton – with Vanzo joining later – represented, suggested, and/or implied, among other things, that: AWA had "good, positive updates on every one" of the investments discussed, that AWA had "strong data" supporting expected timing and distributions, and that expected distributions were "pretty substantial."

85.    With respect to the Aries Bonds investment, Walton characterized the investment as effectively protected against loss – stating there was "no risk of loss of money" "from a realistic standpoint," and suggesting it was "guaranteed," including by asserting that a "multi[-]billion dollar family office" stood behind it.

86.    Walton went so far as to glowingly assert that the investment was "going

screamingly well", and that "[e]veryone in America would have to lose their money for that [investment] not to be guaranteed".

87.    In further describing the same Aries Bond-related "guarantee," Walton stated that, if the underlying project failed, the family office "has to pony up principal," reinforcing the impression that Plaintiff's principal was effectively backstopped.

88.    Similarly, during a quarterly meeting call on June 3, 2025, Walton and Vanzo provided additional misleading, incorrect, exaggerated, and/or false commentary and projections regarding Plaintiff's (and also its principal's) investments and Defendants' recommended strategies and the magnitude, safety, and tax treatment of anticipated returns, including by representing, among other things, that Plaintiff's account was "tracking at 7% annualized" and Plaintiff had already "made $1.6 million", and that Plaintiff's (and its principal's) portfolio was "up about 28%" since Defendants "put it in place".

C. **Regulatory Violations**

89.    Walton's, Vanzo's and AWA's acts and omissions have run afoul of regulations governing investment advisors.

(i)    *Investment Advisers Act Section 206(2)*

90.    At all relevant times, AWA was a registered investment adviser with the SEC, and Walton and Vanzo were registered investment adviser representatives of AWA.

91.    As such, Walton, Vanzo and AWA owed Plaintiff fiduciary duties under the Investment Advisers Act of 1940, including the duties imposed by Section 206(2), which prohibits any transaction, practice, or course of business that operates as a fraud or deceit upon any client and requires an adviser to act with a duty of loyalty and a duty of care – serving the client's best interests and not placing the adviser's own interests ahead of the client's.

92.    Instead of honoring these duties, Walton, Vanzo and AWA, among other things, recommended and caused Plaintiff to purchase and hold a $10,000,000 position in the Aries Bonds despite Plaintiff's stated moderate risk tolerance and short-term growth objective; misrepresented and omitted material facts concerning the Aries Bonds' speculative, subordinated, and illiquid nature and the deteriorating credit profile of the underlying project; and provided misleading assurances of safety and "guaranteed" performance.

93.    By reason of the foregoing, Walton and AWA engaged in transactions, practices, and a course of business that collectively operated as a fraud or deceit upon Plaintiff within the meaning of Section 206(2) of the Investment Advisers Act, including but not limited to recommending highly unsuitable, illiquid, and speculative investments, and making material misstatements and omissions regarding risks, compensation, and expected performance.

### (ii)    Advisers Act Section 206(1)

94.    Section 206(1) of the Investment Advisers Act makes it unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to employ any device, scheme, or artifice to defraud any client or prospective client.

95.    As set forth above, Walton, Vanzo and AWA employed such devices, schemes by knowingly or recklessly making materially false and misleading statements and omitting material facts about the Aries Bonds' risk profile, illiquidity, and purported third-party backing, and thereby inducing Plaintiff to purchase and hold the Aries Bonds.

### D.    Discovery of Defendants' Violations & Breaches

96.    In or about early 2025, as Defendants continued to propose complex investment structures and related, increasingly questionable transactions to Plaintiff's principal, Plaintiff grew

concerned about the suitability and integrity of the investments and strategies that Defendants had recommended and implemented.

97.    As a result, Plaintiff retained legal counsel to further review its investments and investigate the actions of the Defendants.

98.    Plaintiff's counsel thereafter discovered in June 2025 that Walton, Vanzo and AWA had engaged in grave regulatory violations, breaches of fiduciary duty, misrepresentations, omissions, and other wrongful conduct in their provision of services to Plaintiff and its principal, including, specifically, Defendants' conduct in effectuating Plaintiff's investment in the clearly unsuitable Aries Bonds.

99.    On or about July 1, 2025, Plaintiff's counsel issued a comprehensive letter to Walton and AWA, formally terminating the advisory relationship and investment advisory agreement, demanding that Walton and AWA cease acting in any advisory or fiduciary capacity for Plaintiff, preserve all relevant documents and communications, and engage in good-faith discussions to compensate Plaintiff for its losses and damages.

100.    In response, Walton has largely failed and refused to substantively address or comply with Plaintiff's demands, and has not compensated Plaintiff for the losses and damages arising from Defendants' conduct.

101.    Plaintiff's principal initiated an arbitration against Walton and AWA before the American Arbitration Association on or about October 20, 2025, with respect to certain claims subject to arbitration, and also filed a complaint in federal court against Walton, Vanzo, AWA and others with respect to claims not subject to arbitration.

102.    Plaintiff initiated an arbitration against the broker-dealer Sanders Morris LLC before the Financial Industry Regulatory Authority (FINRA) on or about November 21, 2025.

**COUNT I**
**Violation of Section 10(b) of the Securities Exchange**
**Act of 1934 and Rule 10b-5 (17 C.F.R. § 240.10b-5)**
**(Against Walton, Vanzo & AWA)**

103.     Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

104.     Pursuant to 17 C.F.R. § 240.10b-5, it is "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

105.     To state a claim for violation of the Securities Exchange Act § 10(b), a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Charles Schwab Corporation v. Bank of America Corporation*, 883 F.3d 68, 92 (2d Cir. 2018); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (internal quotation marks omitted).

106.     Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007); quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-194 (1976).

107.     As set forth above, Walton, Vanzo and AWA, by use of the mails, telephone,

electronic communications, and other instrumentalities of interstate commerce, employed a scheme to defraud Plaintiff and to obtain money and property by means of materially false and misleading statements and omissions regarding the Aries Bonds, thereby inducing Plaintiff to purchase $10,000,000 of the Aries Bonds and to remain invested as their value collapsed.

108.    Walton, Vanzo and AWA made untrue statements of material fact, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including, without limitation: (a) repeatedly representing in advisory agreements and communications that they would act as fiduciaries and place Plaintiff's interests "at the forefront – ahead of the interests of any individual Advisor representative or the firm," while structuring transactions to benefit Defendants; (b) touting the overall portfolio construction as prudent and aligned with Plaintiff's objectives while failing to disclose the degree of concentration, illiquidity, and speculative risk; and (c) making aggressive performance projections without a reasonable basis and without disclosing the true risk profile and downside potential of the underlying securities.

109.    Walton, Vanzo and AWA further omitted to disclose, among other material facts that securities recommended for Plaintiff's portfolio – specifically the $10,000,000 of Aries Linden bonds – were speculative, distressed, or otherwise inconsistent with a prudent, diversified strategy for an investor in Plaintiff's position.

110.    These misstatements and omissions were material.

111.    Walton, Vanzo and AWA acted with scienter – that is, with intent to deceive, manipulate, or defraud Plaintiff, or at a minimum with severe recklessness.

112.    Their scienter is evidenced by, among other things: (a) the concentration of Plaintiff's portfolio in a narrow set of high-fee, high-risk, and illiquid securities that generated

substantial economic benefit for Walton, Vanzo, AWA, and favored managers; and (b) the making of extreme return projections and marketing claims without a reasonable basis.

113.    There is a direct and proximate connection between these material misrepresentations and omissions and Plaintiff's purchase and holding of the securities at issue.

114.    Plaintiff would not have purchased or maintained the securities positions had it known the true facts regarding the actual risk/return profiles of the investments.

115.    Plaintiff justifiably and reasonably relied on Walton's, Vanzo's and AWA's misrepresentations and omissions in purchasing and holding the other securities described above.

116.    Plaintiff engaged Walton, Vanzo and AWA precisely because they held themselves out as fiduciary advisers and wealth managers, signed an agreement that expressly committed AWA to act with a fiduciary standard of care, and had no reason to suspect that Defendants were structuring transactions for their own benefit.

117.    Plaintiff lacked equal access to the material information that Walton, Vanzo and AWA possessed or controlled and reasonably relied on its adviser's expertise, recommendations, and disclosures.

118.    As a direct and proximate result of Walton's, Vanzo's and AWA's violations of Section 10(b) and Rule 10b-5, Plaintiff has suffered substantial economic losses and damages, including, without limitation: (a) realized losses and write-downs on securities purchased in reliance on Defendants' misrepresentations and omissions (i.e., the distressed or effectively worthless Aries Linden bonds position); (b) the loss of liquidity and flexibility resulting from concentration in illiquid and speculative securities; and (c) opportunity-cost damages from having millions of dollars diverted into conflicted, under-performing, and unsuitable investments rather than into diversified portfolios aligned with Plaintiff's true goals and risk tolerance.

119.    These losses were the foreseeable and natural consequence of the scheme and course of dealing described above.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against Walton, Vanzo and AWA, jointly and severally, and provide the following relief: (a) compensatory damages, incidental damages, and consequential damages; (b) costs, interest, and reasonable attorneys' fees; (c) prejudgment and post-judgment interest; and (d) such other relief as the Court deems just and equitable.

### COUNT II
**Control Person Liability Under Section 20(a)**
**of the Securities Exchange Act of 1934 (15 U.S.C. § 78t(a))**
**(Against Walton & Vanzo)**

120.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

121.    As alleged in Count I, Defendant AWA committed primary violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 in connection with the purchase or sale of securities, causing Plaintiff injury and damages.

122.    At all relevant times, Defendant Walton, as founder and owner of AWA, possessed and exercised actual power and control over AWA, including AWA's operations, policies, and practices, and the specific conduct and transactions detailed in this Complaint.

123.    At all relevant times, Defendant Vanzo, as President of AWA, likewise possessed and exercised actual power and control over AWA, including AWA's operations, policies, and practices, and the specific conduct and transactions detailed in this Complaint.

124.    To state a claim under Section 20(a), a plaintiff must allege (i) a primary violation of the Securities Exchange Act and (ii) that the defendant exercised actual power or control over the primary violator.  If such control is shown, liability attaches unless the controlling person acted

in good faith and did not directly or indirectly induce the violation.

125.    By reason of the foregoing, Walton and Vanzo are "controlling persons" of AWA within the meaning of Section 20(a), and are liable jointly and severally with, and to the same extent as, AWA for AWA's primary violations of Section 10(b) and Rule 10b-5 as alleged herein.

126.    Walton and Vanzo did not act in good faith and directly or indirectly induced the acts and omissions constituting AWA's violations, including by participating in, directing, authorizing, approving, and/or failing to stop or correct the wrongful conduct alleged in detail herein despite their ability to do so.

127.    As a direct and proximate result of Walton's and Vanzo's control-person violations, Plaintiff has suffered damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendants Walton and Vanzo, jointly and severally, and award: (a) compensatory damages, incidental damages, and consequential damages; (b) pre-judgment and post-judgment interest; (c) costs and reasonable attorneys' fees to the extent permitted by law; and (d) such other and further relief as the Court deems just and equitable.

**COUNT III**
**Breach of Fiduciary Duty**
**(Against Walton, Vanzo & AWA)**

128.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

129.    A claim for breach of fiduciary duty requires that a fiduciary duty existed and that the defendant breached that duty.  See generally *Kopittke v. Dealer Mkt. Exch. PR LLC*, No. CV 21-1059 (ADC), 2022 WL 22895016 (D.P.R. Mar. 31, 2022); *Reinhardt v. Gulf Ins. Co*., 489 F.3d 405 (1st Cir. 2007); *Sewell v. Great N. Ins. Co*., 535 F.3d 1166, 1172 (10th Cir. 2008).

130.    Walton, Vanzo and AWA, as Plaintiff's investment adviser and adviser representatives, owed Plaintiff a fiduciary duty of utmost good faith, loyalty, and care in connection with the management of Plaintiff's assets and the provision of investment advice.

131.    By written agreement, AWA expressly agreed to treat Plaintiff with a "Fiduciary Standard of Care" such that Plaintiff's interests would always be placed at the forefront, ahead of the interests of any individual adviser representative or the firm.

132.    Independently of these contractual undertakings, as an SEC-registered investment adviser, AWA owed fiduciary duties under the Advisers Act, including a duty of loyalty and a duty of care, requiring that the adviser at all times serve the best interest of its client and not place its own interest ahead of its client's interests.

133.    Walton and Vanzo, as the primary investment adviser representatives serving Plaintiff, owed fiduciary duties directly to Plaintiff.

134.    The fiduciary duties owed by Walton, Vanzo and AWA included, without limitation: (a) the duty to provide investment advice that was loyal, prudent, and in Plaintiff's best interests; (b) the duty to avoid, where possible, self-dealing and conflicted transactions that favored the adviser's interests over those of the client; (c) the duty to construct and monitor an investment portfolio that was suitable and appropriately diversified in light of Plaintiff's objectives, risk tolerance, and liquidity needs; and (d) the duty to implement and follow compliance policies and procedures reasonably designed to identify, manage, and mitigate conflicts and risks.

135.    Walton, Vanzo and AWA breached these fiduciary duties.

136.    Walton, Vanzo and AWA breached their fiduciary duties by recommending, causing, and maintaining Plaintiff's $10,000,000 investment in the Aries Bonds despite Plaintiff's investment objectives and risk profile; failing to conduct reasonable diligence or to form a

24

reasonable basis for recommending the Aries Bonds; failing to provide full and fair disclosure of material risks, illiquidity, and adverse credit developments; and giving misleading assurances regarding "guaranteed" performance and purported third-party support.

137.    Despite the scale and illiquidity of Aries Bonds investment, Walton, Vanzo and AWA never prepared or delivered a completed, client-specific Investment Policy Statement memorializing Plaintiff's objectives, risk tolerance, and strategy, and failed to frequently update the IPS, contrary to AWA's own Form ADV representations. This failure further evidences their disregard for the duty of care and prudent portfolio construction.

138.    Walton, Vanzo and AWA failed to establish and follow an adequate compliance program reasonably designed to identify and address suitability issues across Plaintiff's portfolio.

139.    The distressed Aries Bonds exposure should have triggered heightened compliance review and mitigation of conflicts. Instead, they were allowed to proceed as part of a systematic pattern of self-interested advice.

140.    These acts and omissions constitute breaches of Walton's, Vanzo's and AWA's fiduciary duties of loyalty and care to Plaintiff. Rather than structuring transactions and investments to serve Plaintiff's best interests, Walton, Vanzo and AWA repeatedly structured and recommended transactions that subordinated Plaintiff's interests to their own and systematically exploited Plaintiff's trust.

141.    As a direct and proximate result of these breaches of fiduciary duty, Plaintiff has suffered and continue to suffer substantial damages, including but not limited to: (a) multi-million-dollar realized losses and write-downs on private market and structured investments; (b) loss in value and effective impairment of the ACM2 and downstream investments; (c) the drain of more than $15 million in premiums already paid under the MassMutual policy and the massive

opportunity costs associated with locking capital into that product rather than investing in a diversified portfolio; (d) the risk that any future insurance proceeds will be diverted to ACM2 and related parties rather than to Plaintiff's intended beneficiaries; (e) excessive and undisclosed fees, commissions, and compensation to Walton, Vanzo, AWA, and their affiliates; and (f) additional consequential and incidental damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against Walton, Vanzo and AWA, jointly and severally, and provide the following relief: (a) compensatory damages, incidental damages, and consequential damages; (b) costs, interest, and reasonable attorneys' fees; (c) prejudgment and post-judgment interest; and, (d) such other relief as the Court deems just and equitable.

<u>COUNT IV</u>
**Breach of Contract**
**(Against Walton, Vanzo & AWA)**

142.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

143.    The elements of a cause of action for breach of contract are the existence of a valid contract, a breach by one of the parties to the contract, and resulting damages.  See generally *Torres v. Bella Vista Hosp., Inc.,* 523 F. Supp. 2d 123 (D.P.R. 2007); *TBL Collectibles, Inc. v. Owners Ins. Co.,* 285 F. Supp. 3d 1170, 1197 (D. Colo. 2018).

144.    Walton, Vanzo and AWA entered into a written Assets Under Advisement Investment Agreement with Gamer Robot dated December 12, 2024 (the "Advisory Agreement").

145.    The Advisory Agreement is a valid and enforceable contract supported by adequate consideration.

146.    Under the Advisory Agreement, AWA, Vanzo and Walton agreed, among other

things, to provide ongoing investment advisory and wealth management services to Plaintiff, to treat Plaintiff with a fiduciary standard of care, and to act at all times solely in Plaintiff's best interests.

147.    The Advisory Agreement provides, in Exhibit I, that "[i]t is the duty of the Advisor to treat the Client(s) with a Fiduciary Standard of Care – meaning the Client's interests will always be at the forefront – ahead of the interests of any individual Advisor representative or the firm," and that the Advisor will gather necessary information and "recommend an action plan of investment strategies and/or portfolio investments that are designed to accomplish the Client's goals and objectives."

148.    The Advisory Agreement further provides that, "[i]t is agreed that the Investment Policy Statement is a work in progress that must be updated frequently in order to remain relevant and appropriate".

149.    By its terms and as reasonably implied therefrom, the Advisory Agreement required Walton, Vanzo and AWA, inter alia, to: (a) design, implement, and monitor an investment program reasonably aligned with Plaintiff's objectives, risk tolerance, and liquidity needs; (b) recommend only suitable investments and strategies; (c) provide full and fair disclosure of all material conflicts of interest and all material facts necessary for Plaintiff to make informed decisions; (d) place Plaintiff's interests ahead of their own and those of any affiliated persons or entities; (e) avoid or appropriately manage and mitigate self-dealing; (f) provide prudent diversification and risk management; and (g) prepare and use an Investment Policy Statement and other planning tools, as promised, to guide recommendations and implementation.

150.    Plaintiff fully performed its obligations under the Advisory Agreement, including by entering into the agreement in good faith, providing truthful and accurate information about its

financial circumstances and objectives, making the capital contributions and transfers requested or recommended by Walton, Vanzo and AWA, and paying the advisory and related fees charged in connection with their services.

151.    Walton, Vanzo and AWA materially breached the Advisory Agreement by failing to act solely in the best interest of Plaintiff and by failing to treat Plaintiff's interests ahead of their own, as they expressly promised to do.

152.    Instead, they recommended and effected a $10,000,000 purchase of the Aries Bonds, speculative, subordinated, and illiquid securities inconsistent with Plaintiff's objectives and risk tolerance, without conducting reasonable diligence, without providing full and fair disclosure of material risks and adverse developments, and without implementing the promised planning and portfolio-management processes required by the Advisory Agreement.

153.    Moreover, despite expressly representing in the Advisory Agreement that AWA would use an Investment Policy Statement ("IPS") and client interviews to collect the information needed "to create this IPS document" and guide recommendations, and to update the IPS "frequently", Walton, Vanzo and AWA failed to prepare or deliver any such complete or updated IPSs for Plaintiff.

154.    This failure to provide a completed written IPS, or to update it frequently, while simultaneously soliciting and implementing tens of millions of dollars in investments, constitutes an additional breach of their contractual obligations.

155.    These acts and omissions violated the express and implied contractual obligations to avoid self-dealing, to manage conflicts, and to put Plaintiff's interests first.

156.    In addition, Walton, Vanzo and AWA breached the Advisory Agreement by failing to exercise reasonable care and diligence in monitoring and revisiting their investment

recommendations as material red flags emerged – such as credit deterioration at Aries Linden – and by failing to correct or mitigate the unsuitable concentrations they had put in place.

157.    As a direct and proximate result of Walton's, Vanzo's and AWA's breaches of the Advisory Agreement, Plaintiff has suffered and will continue to suffer substantial damages, including, without limitation: millions of dollars in realized losses on investments; significant opportunity-cost damages associated with capital locked into illiquid and underperforming products; advisory and related fees paid for services that were not rendered in accordance with contractual promises; and additional consequential and incidental damages in amounts to be proven at trial.

158.    Plaintiff is entitled to recover all such damages, together with interest, costs, and such other relief as the Court deems just and proper.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against Walton, Vanzo and AWA, jointly and severally, and provide the following relief: (a) compensatory damages, incidental damages, and consequential damages; (b) costs, interest, and reasonable attorneys' fees; (c) prejudgment and post-judgment interest; and, (d) such other relief as the Court deems just and equitable

### COUNT V
**Professional Negligence/Negligence**
**(Against Walton, Vanzo & AWA)**

159.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

160.    To establish liability for negligence, a plaintiff must demonstrate that the defendant owed the plaintiff a duty, that the defendant breached said duty, that the plaintiff suffered damages, and that those damages were caused by the defendant's breach of duty.  See generally *Martinez-*

*Suarez v. Mansiones de Garden Hills Apartments*, 556 F. Supp. 3d 1 (D.P.R. 2021); *Dolin v. Contemp. Fin. Sols., Inc.,* 622 F. Supp. 2d 1077 (D. Colo. 2009).

161.    At all relevant times, Walton, Vanzo and AWA, as Plaintiff's investment adviser and adviser representatives, owed Plaintiff a duty to exercise reasonable care, skill, and diligence in providing investment advice, constructing and monitoring Plaintiff's portfolios, and recommending and implementing investment and insurance transactions.

162.    That duty included, without limitation: (a) reasonably investigating and understanding the risks, costs, and characteristics of the investments and strategies they recommended; (b) recommending only suitable investments consistent with Plaintiff's objectives, risk tolerance, and liquidity needs; (c) constructing a reasonably diversified and risk-managed portfolio; and (d) avoiding or appropriately managing conflicts of interest so that recommendations were not tainted by self-interest.

163.    Walton, Vanzo and AWA breached the foregoing duties and deviated from the applicable standard of care by, among other things, failing to reasonably investigate and understand the Aries Bonds and the underlying Aries Linden project; recommending and causing Plaintiff to purchase a $10,000,000 position in a speculative, distressed, and highly illiquid bond investment that was inconsistent with Plaintiff's objectives and moderate risk tolerance; misrepresenting and omitting material facts about the Aries Bonds' risks, illiquidity, and credit deterioration; and failing to appropriately monitor the investment or recommend timely risk-mitigation actions as red flags and defaults emerged.

164.    As a direct and proximate result of these negligent acts and omissions, Plaintiff suffered substantial losses and other damages.

165.    Plaintiff is entitled to recover those damages, together with interest, costs, and such

other relief as the Court deems just and proper.

   **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against Walton, Vanzo and AWA, jointly and severally, and provide the following relief: (a) compensatory damages, incidental damages, and consequential damages; (b) costs, interest, and reasonable attorneys' fees; (c) prejudgment and post-judgment interest; and, (d) such other relief as the Court deems just and equitable

### COUNT VI
### Negligent Supervision
### (Against Defendants Walton, Vanzo and AWA)

   166.   Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

   167.   AWA owed Plaintiff a duty to exercise reasonable care in the hiring, training, supervision, and oversight of its supervised persons, including but not limited to Walton and Vanzo, and to adopt and enforce policies and procedures reasonably designed to prevent foreseeable harm to clients from conflicted, unsuitable, or negligently implemented investment strategies.

   168.   AWA, acting through its management and supervisory personnel (including Vanzo), failed to exercise reasonable supervision over Walton's and other supervised persons' conduct with respect to Plaintiff's account.

   169.   Among other things, AWA failed to adopt, implement, and enforce policies and procedures reasonably designed to ensure that high-risk, concentrated, and illiquid securities recommendations, such as the $10,000,000 Aries Bonds purchase, were subjected to heightened suitability and due diligence review and were appropriately documented; failed to ensure that required disclosures were made; and failed to detect and correct Walton's misleading statements

and omissions regarding the Aries Bonds.

170.    Vanzo, as President and supervisory principal, likewise failed to reasonably supervise Walton's conduct and to prevent the foreseeable harms described herein.

171.    By reason of the foregoing, Defendants Walton, Vanzo and AWA are liable to Plaintiff for negligent supervision.

172.    As a direct and proximate result of Defendants' negligence, Plaintiff has sustained and will continue to sustain substantial damages, including, without limitation, realized and unrealized investment losses, loss of use of capital, opportunity-cost damages, premium payments, and other consequential and incidental damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against Walton, Vanzo and AWA, jointly and severally, and provide the following relief: (a) compensatory damages, incidental damages, and consequential damages; (b) costs, interest, and reasonable attorneys' fees; (c) prejudgment and post-judgment interest; and, (d) such other relief as the Court deems just and equitable

**COUNT VII**
**Unjust Enrichment / Disgorgement**
**(Against All Defendants)**

173.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

174.    The elements of an unjust enrichment claim are: (1) an enrichment of a defendant, (2) at plaintiff's expense, (3) a relation between the enrichment and the deprivation, (4) under circumstances that would make it unjust for the defendant to retain the benefit.  See generally *Wiley v. Stipes,* 595 F. Supp. 2d 179, 188 (D.P.R. 2009); *Oaster v. Robertson*, 173 F. Supp. 3d 1150 (D. Colo. 2016).

175.    Defendants have been enriched at Plaintiff's expense by receiving and retaining advisory fees and other compensation paid in connection with Defendants' advisory relationship with Plaintiff, including fees calculated on or derived from the assets invested in the Aries Bonds.

176.    Defendants' retention of those fees is unjust because the compensation was obtained while Defendants were breaching their contractual and fiduciary duties and engaging in negligent and fraudulent conduct, and because Plaintiff would not have paid such fees had it known the truth about the Aries Bonds and Defendants' misconduct

177.    Accordingly, Plaintiff seeks restitution from, and disgorgement by, each Defendant of all unjust benefits received from or traceable to Plaintiff's assets and capital, including but not limited to all advisory, management, or related fees paid to AWA in connection with the advisory relationship and investments, and any other profits, distributions, or economic benefits realized by Defendants that are causally connected to Plaintiff's capital, premiums, or other property.

178.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiff has suffered and continues to suffer substantial harm, including the loss and impairment of capital, payment of excessive and conflicted fees and commissions, and the deprivation of the use and benefit of funds that rightfully belong to it.

179.    Plaintiff is entitled to restitution, disgorgement of all ill-gotten gains, the imposition of a constructive trust over assets and proceeds traceable to its capital, and such other equitable relief as the Court deems just and proper.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against those Defendants found to have been unjustly enriched by, or to have received ill-gotten gains derived from, Plaintiff's assets, jointly and severally to the fullest extent permitted by law, and respectfully requests that the Court:

a. Order such Defendants to disgorge and pay over to Plaintiff, as restitution, all fees, commissions, advisory compensation, policy-related compensation, distributions, profits, and any other benefits, directly or indirectly obtained from or at the expense of Plaintiff;

b. Impose a constructive trust and/or equitable lien in favor of Plaintiff over all funds, assets, and property, and all proceeds thereof, traceable to Plaintiff's capital, premiums, or other assets wrongfully obtained, retained, or used by such Defendants;

c. Direct such Defendants to provide a full and complete accounting of all monies, assets, and other benefits received from, or derived from, Plaintiff's funds or investments, sufficient to identify all ill-gotten gains subject to restitution and disgorgement;

d. Award Plaintiff pre-judgment and post-judgment interest on all such amounts, at the maximum rate allowed by law; and

e. Grant such other and further legal or equitable relief as the Court deems just and proper.

Dated:  January 16, 2026

**McCONNELL VALDÉS LLC**
270 Muñoz Rivera Ave.
Hato Rey, PR  00918
P.O. Box 364225
San Juan, PR  00936-4225
http://www.mcvpr.com
Tel. (787) 250-5637
Fax. (787) 759-8282
*Attorneys for Plaintiff*

/s/ Alejandro J. Cepeda-Díaz
Alejandro J. Cepeda-Díaz
USDC-PR No. 222110
ajc@mcvpr.com

/s/ Sonia M. López-del Valle
Sonia M. López-del Valle
USDC-PR No. 231413
sld@mcvpr.com

*Pro hac vice application forthcoming:*
**McCORMICK & O'BRIEN, LLP**

By:_____
    Liam O'Brien, Esq.
    125 Park Avenue, 25th Flr.
    New York, New York 10017
    Telephone: (212) 320-8972 x700
    lobrien@mcoblaw.com
    *Attorneys for Plaintiff*